UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| CITY OF WARREN GENERAL EMPLOYEES' RETIREMENT SYSTEM, on Behalf of Itself and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>TELEPERFORMANCE SE, *et al*.<br><br>Defendants. | Case No. 1:23-cv-00181-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

### INTRODUCTION

Before the Court is Defendant Teleperformance SE's Motion to Transfer Venue (Dkt. 26). The motion is fully briefed and before the court. For the reasons explained below, the Court will grant the motion.

### BACKGROUND

The City of Warren General Employees' Retirement System ("The City"), a Michigan-based retirement fund, filed a class action lawsuit against Teleperformance, SE and several of its corporate officers, including CEO Daniel Julien, Deputy CEO and CFO Olivier Rigaudy, and Akash Pugalia, the Global President of Trust and Safety. The suit alleges that Teleperformance and its

officers violated § 10(b), Rule 10b-5, and § 20(a) the Securities Exchange Act of 1934 by making false statements about employee working conditions that inflated the company's stock prices.

Teleperformance is a global company that provides "omnichannel customer experience management services and related digital services" to companies. *Pl's Resp.* at 5, Dkt. 29. It is based in Paris, France but has numerous offices throughout the United States in the form of subsidiary entities. These include an office in Boise, Idaho, an office in Port St. Lucie, Florida, and corporate headquarters in Miami, Florida. Of relevance to this action are Teleperformance's content-moderation services. Content moderation services use both AI and company employees to review potentially inappropriate or dangerous user-generated content on digital platforms for the purpose of flagging or removing that content. From 2020 to 2022, Teleperformance provided content moderation services for various digital platforms, including TikTok.

Between 2020 and 2022, Teleperformance experienced growth in its Core Services and Digital Integrated Business Services (i.e., content moderation). As a result, content moderation grew to account for approximately 9% of the company's profitability in 2022. During this time, Teleperformance touted its success through numerous press releases and earnings calls, including by highlighting the fact that the company had been named a "Great Place to Work®" after evaluation by

independent third parties. Teleperformance, through its corporate officers Julien, Rigaudy, and Pugalia, claimed to make employee well-being "a key priority." Teleperformance also claimed to "deploy[] a number of initiatives and tools in the areas of hiring, professional training and development, human rights, diversity and inclusion, wellbeing, and occupational health and safety," and emphasized its "commitment to corporate and social responsibility." *Compl*. at 27, Dkt. 1. Teleperformance officers made these and other similar statements between July 29, 2020, and November 9, 2022.

On August 4, 2022, *Forbes* Magazine published an article entitled, "TikTok Moderators are Being Trained Using Graphic Images of Child Sexual Abuse." The article cited interviews with current and past Teleperformance content moderators who revealed that Teleperformance provided access to real images of child pornography, terrorism, and other graphic content for training purposes. The content moderators were allegedly instructed to refer to this content as they moderated platforms to inform them of what was and was not appropriate. Many of those interviewed also said that repeatedly viewing explicit content on the job severely impacted their mental health, and that they felt Teleperformance did not provide adequate mental health care. *Time* Magazine published a similar article on October 20, 2022. That article also cited interviews with Teleperformance content moderators who made similar claims to those described in the *Forbes* article. Most

MEMORANDUM DECISION AND ORDER - 3

of the interviewed employees were either based in El Paso, Texas, or Colombia, South America. One prior employee who was quoted in the article had previously worked in Boise, Idaho.

Following the publication of these articles, the price of Teleperformance American Depositary Receipts[1] (ADRs) declined over 50% from its Class Period high. The City alleges that the defendants' statements regarding the success of the company and the prioritization of employee well-being were false and therefore violated the Securities Exchange Act of 1934. In other words, The City alleges that Teleperformance executives made false statements regarding their employees' working conditions and therefore knowingly inflated company stock prices.

The City then filed a securities class action lawsuit in this Court on behalf of all persons who purchased Teleperformance ADRs between July 29, 2020 and November 9, 2022. Teleperformance filed the present Motion to Transfer Venue on August 15, 2023, asking this Court to transfer the case to the United States District Court for the Southern District of Florida. For the reasons explained below, the Court will grant the Motion.

---

[1] American Depositary Receipts are negotiable certificates issued by U.S. depositary banks. The certificates represent shares in a foreign company and eliminate the need for U.S. investors to purchase shares through that country's exchange system.

**MEMORANDUM DECISION AND ORDER - 4**

## LEGAL STANDARD

Federal courts have discretion to transfer any case for "the convenience of the parties and the witnesses, in the interest of justice[]" to any other district in which the suit may have been brought. 28 U.S.C. § 1404(a). Courts may balance both private and public factors in their decision. The Ninth Circuit has outlined eight private factors (the *Jones* factors) for courts to consider when deciding § 1404(a) motions to transfer:

> (1) the location where any relevant agreements were negotiated and executed; (2) the state most familiar with the governing law; (3) the plaintiff's choice of forum; (4) the respective parties' contacts with the forum; (5) contacts relating to the plaintiff's cause of action in the chosen forum; (6) differences in the cost of litigation in the two forums; (7) the availability of compulsory process to compel attendance of unwilling non-party witnesses; and (8) the ease of access to sources of proof.

*Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 798 (9th Cir. 2000). Defendants bear the burden to make a "strong showing of inconvenience" to favor transfer. *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986).

The Court will first address each private factor, and then consider public factors including court congestion, the local interest in having localized interests decided at home, and the familiarity of the forum with the law that will govern the case. *N. Am. Commc'ns, Inc., v. Eclipse Acqui Inc.*, No. 3:17-167, 2018 WL 651795 (W.D. Pa. Jan. 31, 2018).

## ANALYSIS

1. **The *Jones* Factors**

The first two *Jones* factors—the location of relevant negotiated agreements and the state familiar with the governing law—are irrelevant. There are no alleged negotiated agreements at issue in this case, and securities actions are governed by federal law.

Plaintiffs argue that the third factor—the plaintiff's forum choice—should be afforded great weight. The City principally argues that Boise is "one of the primary loci" for the events at issue and is thus the proper site for litigation. *Compl.* ¶ 3, Dkt. 1. However, the parties disagree as to what constitutes the operative events and the "primary loci" of those events. The City characterizes the operative events as the company training policies that Teleperformance employees were allegedly subject to. Teleperformance counters that the key events are the statements made by Teleperformance executives and the development of the disputed company training policies, which occurred in France and Florida, respectively. *Def's. Resp.* at 3–4, Dkt. 30.

This is a securities fraud case based upon allegedly false or misleading statements. The operative events therefore include any circumstances or actions taken by Teleperformance executives that may prove or disprove the making of such statements or the truth or falsity of such statements. Naturally, the challenged

statements cannot be determined to be false or misleading without evidence from which the factfinder can evaluate the statements. That evidence consists of company policies that affected employees at the location of their employment, including in Boise, Idaho. Therefore, Plaintiffs' "primary loci" argument has merit; the "operative events" would not be so operative if not for the events occurring at content moderation sites. So, factor three—plaintiff's choice of forum, grounded in the "primary loci" argument—weighs against transferring venue.

But the Court sees two issues with Plaintiffs' "primary loci" argument that make this factor less weighty. First and foremost, this is a class action lawsuit. In class action suits, the usual deference to a plaintiff's choice of forum is given less weight. *See Lou v. Belzberg*, 834 F.2d 730, 739 (9th Cir. 1987). Just how much weight depends, instead, on the extent of the parties' contacts with the chosen forum (*Jones* factors four and five). *Id.* Here, both parties have limited contacts with the chosen forum. Teleperformance has one subsidiary office in Boise where some of the relevant facts allegedly occurred, but the named individual defendants do not work in Idaho and reportedly have never been to Idaho. Likewise, the lead plaintiff is based in Michigan and seemingly lacks any meaningful contacts with Idaho. Where a plaintiff does not reside within its chosen district, its choice will be afforded even less weight. *See, e.g., Healey v. Spencer*, No. cv-09-7596, 2010 WL 669220, at *1 (C.D. Cal. Feb. 22, 2019).

**MEMORANDUM DECISION AND ORDER - 7**

The second weakness in The City's "primary loci" argument is that Boise is merely "one of" the locations in which the alleged employee training misconduct occurred. Teleperformance provides content moderation services out of three offices in the United States: Boise, Idaho, El Paso, Texas, and Port St. Lucie, Florida. The majority of Teleperformance's content moderators are based in the Republic of Columbia. Based on The City's Complaint (Dkt. 1) and the parties' briefing, there is no indication that Idaho is home to more potential witnesses than Port St. Lucie or El Paso, or that any of the alleged misconduct—that is, any false or misleading statements—occurred here. Indeed, most of the Teleperformance employees referenced in the Complaint worked either in El Paso, Texas, or Colombia. Only one person had ever reportedly worked in Idaho, and there is no indication that they still reside here, or that The City intends to call them as a witness. Finally, the documents that The City claims reveal evidence of securities fraud are apparently company-wide policies of Teleperformance that were available to all content moderators world-wide—not just the moderators who worked in Idaho. So, while the issue of content-moderator policies arguably "relates" to Idaho in that the Boise office provided content-moderation services pursuant to those policies, there does not appear to be any unique connection between those policies and the Boise office.

The sixth factor, costs to the parties, clearly weighs in favor of transferring this case to the Southern District of Florida. Teleperformance's corporate office is located in Miami, Florida. The lead plaintiffs are based out of Michigan. The City does not address the cost difference between litigating in Idaho and litigating in Florida, but Teleperformance insists that the financial burden would be significantly less for both parties if this case is transferred to Florida. That is undoubtedly true for Teleperformance, which has a corporate office in Florida and a content moderation office in Florida. It is also true for at least one of the party-witnesses in the case, CEO Daniel Julien, who has a residence in Florida. Further, as for the other party witnesses who are based in France, travelling from France to Florida is much less expensive and time consuming than traveling from France to Idaho. Indeed, it would add nearly a full day's worth of travel for party-witnesses to litigate in Idaho. The City is similarly based much closer to Florida than Idaho, meaning that even for the lead plaintiff, the cost of litigation and convenience of travel weigh in favor of transferring venue.

Finally, the seventh and eighth *Jones* factors favor transfer. Plaintiffs argue that there are "hundreds of potential non-party witnesses" in Idaho. *Pl.'s Resp*. at 5. The Federal Rules of Civil Procedure provide district courts with the authority to compel a non-party witness to "attend a trial, hearing, or deposition . . . within 100 miles of where the person resides, is employed, or regularly conducts business."

MEMORANDUM DECISION AND ORDER - 9

FED. R. CIV. P. 45(c)(1)(A). Thus, if this case were transferred from Idaho to Florida, Plaintiffs' hypothetical non-party witnesses could not be compelled to appear in court for trial. The seventh *Jones* factor weighs heavily in favor placing venue where non-party witnesses are located. *See e.g.*, *In re Orion Marine construction, Inc.*, No. 3:20-cv-00309, 2020 WL 8083679 (S.D. Tex. 2020). But while the convenience of non-party witnesses is considered when deciding whether transfer venue, Plaintiffs have not actually identified any such witnesses, and the Court cannot refuse to transfer venue based on the speculative presence of potential, unnamed, non-party witnesses. *See Tran v. Third Ave. Mgmt. LLC*, 2016 WL 6828217, at *4, 6 (C.D. Cal. Apr. 12, 2016). The City does not name any witnesses other than those party witnesses identified in the Complaint. Teleperformance names one non-party witness in their Reply brief, and that witness is located in Florida. *See Def.'s Memo. in Supp.* at 2, Dkt. 26-1. Because the parties have identified only one potential non-party witness between them, and that witness is located in Florida, this factor weighs in favor of transfer.

The eighth *Jones* factor—ease of access to sources of proof—similarly weighs in favor of transfer. Teleperformance's United States corporate office is located in Florida, so any documented information pertaining to Teleperformance's corporate policies are presumably in Florida (if not in France). Granted, this factor is less weighty due to the modern-day ease of digital sharing and the fact that

MEMORANDUM DECISION AND ORDER - 10

Teleperformance's headquarters are abroad. Nevertheless, to the extent this factor does apply, it weighs in favor of transfer.

**2.     Public Interest Factors**

Courts may also consider relevant public interest factors, including court congestion, the localized interest in having local interests decided at home, and the familiarity of the forum with the governing law. *U.S. ex rel. Brooks v. Stevens-Henager College, Inc.*, No. 1:13-cv-00009, 2015 WL 758988, at *11 (D. Idaho Feb. 23, 2015). These public interest factors also support Teleperformance's request to transfer venue to Florida.

First, Teleperformance has a presence in both Idaho and Florida, so both states unquestionably have an interest in deciding the controversy. However, as discussed above, the alleged wrongdoing by Teleperformance involved statements about a company-wide employee training policy that affected each office performing content moderation. Since Teleperformance's corporate headquarters are in Florida, and because Florida is also home to an office that performs content-moderation, the Court concludes that Florida's interest in deciding the controversy is stronger than Idaho's. That is especially true since Plaintiffs have not specifically identified any potential non-party witnesses in Idaho, any physical evidence located in Idaho, nor any factual link between the challenged conduct—the false or misleading statements—and Idaho.

MEMORANDUM DECISION AND ORDER - 11

Next, court congestion also favors transferring venue to the Southern District of Florida. Idaho's federal court has far more pending cases per judgeship—552—than the Southern District of Florida—313. *See* United States District Courts—National Judicial Caseload Profile at 71, 92 (Period ending June 30, 2023) https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile0630.2023.pdf (last visited Nov. 14, 2023). Accordingly, the average time from filing to trial for civil cases in Idaho is 35.7 months, while the average time from filing to trial in the Southern District of Florida is 24 months—nearly a year less. *Id.* Other public interest factors, such as the forum state most familiar with the governing law, remain neutral, as federal law will govern this case. In sum, the public interest factors weigh in favor of transfer to the Southern District of Florida.

## CONCLUSION

The City's argument to maintain venue in Idaho essentially boils down to the fact that Idaho was the venue they selected. But that fact, alone, is not enough to overcome the defendant's showing of inconvenience and cost to the parties and non-party witnesses. The Court will therefore grant Teleperformance's Motion to Transfer Venue (Dkt. 26).

## ORDER

IT IS ORDERED that:

1. Defendant's Motion to Transfer Venue (Dkt. 26) is **GRANTED**.

2.	The Clerk of Court is directed to transfer this case to the United States District Court for the Southern District of Florida.

DATED: December 4, 2023

B. Lynn Winmill
U.S. District Court Judge